IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

LEXI M., by and through her
Parents LEO and KAREN
M. of Mayfield, PA

            Plaintiffs

v.

LAKELAND AREA SCHOOL
DISTRICT,
1355 Lakeland Drive
Scott Township, PA 18433-9801

            Defendant

Civil Action

No.

$3 : CU - 16 - 550$

## COMPLAINT

### I.    Preliminary Statement

1.    This action is brought by Lexi M., a minor child with disabilities, and her Parents Leo and Karen M. (collectively referred to as "Plaintiffs" or the "Family"), against Defendant Lakeland Area School District (the "Defendant" or the "District"). Plaintiffs bring this action pursuant to the Individuals with Disabilities Education Act ("IDEA"), 42 U.S.C. § 1400 et seq., and its federal and state implementing regulations; Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C.A. § 794, and its federal and state implementing regulations; the Americans With Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, et seq., and its federal and state implementing regulations; and Chapters 14 and 15 of the Pennsylvania Code.

2.    Lexi is a student with multiple disabilities who was at all relevant times enrolled in the District. She is currently identified as a student with a disability as defined by IDEA under the classification of Speech/Language Impairment. During her kindergarten through fifth grade school years, the District failed to appropriately evaluate Lexi and address her disabilities and provide her with a Free Appropriate Public Education ("FAPE") as required by IDEA, Section 504, and the ADA. As a result, she failed to make appropriate educational progress

during that period.

3.     Due to the District's failures, on October 8, 2014, the Parents, on behalf of Lexi, initiated a due process hearing via a Due Process Complaint that sought compensatory education from Lexi's 2011-2012 school year through the time that the District develops an appropriate program for Lexi.[1]  Six hearing sessions were held between January 29, 2015 and November 13, 2015.

4.     In a decision dated December 31, 2015 ("Decision"), the presiding Hearing Officer, Cathy A. Skidmore, Esquire, Esquire, granted a portion of the relief sought by the Family, awarding compensatory education for the District's failure to provide appropriate supports for Lexi's Speech/Language needs for the period mid-September 2011 through mid-November 2013. She also found that the District's most recent Individualized Educational Plan ("IEP") for Lexi is inappropriate, in that it omits previous essential supports for Lexi that were recommended by private evaluators and included in the District's previous IEP, and properly ordered the District to reconvene Lexi's IEP team to review those recommendations and develop a plan to address Lexi's ongoing deficits in adaptive/functional skills and to monitor her emotional, behavioral, and executive skill functioning.

5.     Although the Hearing Officer correctly awarded compensatory education to Lexi and her Family, and ordered the IEP team to consider modifications to Lexi's current IEP, the Hearing Officer erred by awarding an insufficient amount of compensatory education, and in other aspects of her Decision.

6.     Initially, the Hearing Officer erred in awarding an insufficient amount of

---

[1]The Parents and the District has previously entered into a tolling agreement to allow the Parents to conduct an Independent Educational Evaluation.  The Parents, pursuant to this agreement, did not seek relief for the period October 10, 2013 through October 8, 2014.

2

compensatory education for the District's violations. The Hearing Officer awarded 35 minutes per week of compensatory education for the time period at issue, based on the maximum amount of Speech/Language services that Lexi was receiving during that period. However, the 35 minutes per week of Speech/Language services that Lexi received was in itself not sufficient to address her needs. The evidence showed that Lexi needed *more* Speech and Language services during that period, and that the Speech/Language services needed to be implemented using a research-based program to appropriately address her needs. The Hearing Officer erred in basing her award of compensatory education on the frequency and type of Speech/Language services that her own Decision found to be inappropriate and insufficient to meet Lexi's needs and allow her to make meaningful progress.

7.    The Hearing Officer also incorrectly found that the District's evaluations of Lexi from 2011 through 2013 were adequate. In fact, the evaluations were inappropriate in that they failed to assess Lexi's demonstrated needs in attention and executive functioning, and failed to assess how Lexi's Speech and Language needs were impacting Lexi's performance in the classroom.

8.    The Hearing Officer also incorrectly found that Lexi's IEPs from November 2013 and October 2014 were appropriate, where the evidence showed that they clearly were not appropriate. The District's November 11, 2013 IEP included all of the same goals as the previous IEP, all of which Lexi *did not meet*. In fact, the District's Speech/Language therapist testified that Lexi did not meet *any* of her IEP goals that were implemented for an entire year and the District's November 11, 2013 IEP provided for an additional seven months to one year to meet those *same* unmet Goals. While the October 2014 IEP changed the wording of the goals, the "new" goals were nevertheless working on the same skills Lexi had been working on since

3

kindergarten, when, at that time, she was in fifth grade. The District's 2014-2015 and 2015-2016 IEP progress reports also indicated Lexi was and is still working on the same skills she has been working on since kindergarten, including articulation of /r/, vocabulary, grammar and syntax, and that she is making very little progress. In fact, a comparison of the District's IEP progress reports over two years demonstrated that Lexi made extremely minimal progress on her IEP goals over that period. As such, compensatory education should have been awarded for the District's failures past November 2013.

9.     Therefore, through this action the Family seeks reversal of certain erroneous aspects of the Hearing Officer's Decision, an additional award of compensatory education, an award of reasonable attorneys' fees and costs as the prevailing party, and other appropriate relief.

## II.     Parties

10.     Lexi was born in 2005, and was at all relevant times enrolled in, and a resident of, the District. Leo and Karen M. are Lexi's parents, and at all relevant times have resided with her in the District.

11.     Lakeland Area School District is located 1355 Lakeland Drive, Scott Township, Pennsylvania. The District is the recipient of several sources of federal funds and is an educational agency designated by Pennsylvania law and the Pennsylvania Department of Education for the provision of educational services to individuals residing within its boundaries; such services include those mandated under IDEA as well as Pennsylvania's statutory/regulatory scheme concerning young children with disabilities. 11 P.S. § 875-101; 22 Pa. Code §§ 14.131 to 14.133; see also, e.g., 24 P.S. Chapter 13; and 22 Pa. Code Chapters 14 and 15.

4

## III.    Jurisdiction and Venue

12.    This Court has original jurisdiction over this appeal pursuant to 28 U.S.C. § 1331 because this case raises federal questions under IDEA, Section 504, and the ADA.

13.    Plaintiffs have exhausted their administrative remedies where required under 20 U.S.C. § 1415(i), having timely pursued a Special Education Due Process Hearing.

14.    The Family's claims and remedies are authorized by 20 U.S.C. § 1415, and under 28 U.S.C. §§ 2201 and 2202, providing for declaratory and any further relief deemed necessary and proper.

15.    All of the Defendant's actions complained of herein have taken place within the jurisdiction of the United States District Court for the Middle District of Pennsylvania.  Venue is appropriate in this District pursuant to 28 U.S.C. § 1391.

## IV.    Additional Facts Supporting Liability

16.    Lexi began therapy at an outside counseling center in January 2010 following a referral by her pediatrician. At the time, Lexi was not following directions and was exhibiting difficult behavior including impulsivity.  Her Parents observed Lexi to struggle with understandable speech and articulation as well as word meanings and handwriting. They also observed her to fidget and to express frustration and anxiety.

17.    The Parents first registered Lexi in the District in May 2010. As part of registration, the Parents informed the District that Lexi was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") and received Early Intervention Services for Speech and Language from the Northeast Intermediate Unit ("NEIU"), as well as Behavioral Specialist Consultative and psychiatric services from mental health agencies.  Moreover, the District received confirmation of Lexi's ADHD from her medical doctor at the time she was registered in

the District on May 18, 2010. Lexi's parents also provided the District with a "Psychology Note" from the Aaron Center, which documented that Lexi was an adopted child, her birth mother was addicted to drugs when she carried Lexi, and the significant impact it had on Lexi in early intervention. Specifically, Lexi was demonstrating inattentive behaviors, picking at her skin, pulling out her hair, scratching and digging at her skin, and zoning or fading out. Nonetheless, Lexi was not evaluated for special education services by the District until the end of November of her kindergarten school year.

18. The District's November 22, 2010 Evaluation Report ("ER") was inappropriate. It included only a minimal Speech and Language assessment, which nevertheless found Lexi eligible under IDEA as a student with Speech and Language Impairment due to her articulation needs and the impact on her classroom performance when communicating with teachers and peers. However, the District's November 2010 ER failed to include any assessments of Lexi's executive functioning or attentional issues, which was necessary given the reason for the referral included "difficulty with focusing on the immediate task." The ER failed to include any assessments of or information regarding Lexi's ability to focus. Moreover, the District failed to conduct any assessments of Lexi's cognitive functioning and academic achievement in order to assess the impact of her Speech and Language impairment on her cognitive functioning and academic achievement.

19. In addition, the results of Lexi's Test of Language Development-Primary-Fourth Edition ("TOLD-4") in November 2010 revealed she was in the Poor range and performing above or better than only two (2) percent of her peers in articulation. However, the District's November 2010 ER incorrectly reported Lexi was articulating in the Average range, which the District's Speech and Language Therapist, Rebecca Masko, indicated was an error in the ER.

6

20.     The District's November 24, 2010 IEP was implemented through the end of Lexi's kindergarten school year and into the fall of her first grade school year. The IEP meeting to develop this IEP failed to include, as required by IDEA, a local education agency representative from the District. In fact, the IEP meeting only included Lexi's parents, her Regular Education Teacher, and her Speech and Language Therapist. The District's November 24, 2010 IEP failed to include appropriate present levels of education for Lexi. Indeed, the present levels of education for Lexi in this IEP was merely "Lexi needs speech services on a weekly basis to work on articulation and attention to task skills."

21.     The District's November 2010 IEP also failed to include adequate goals to address Lexi's complete educational needs. Specifically, the IEP contained only vague goals for vocabulary, auditory comprehension, expressive language, and articulation, that failed to include baselines, which are necessary to measure progress. There was no specific description of how Lexi's progress toward meeting her goals will be measured; it merely indicated "data will be collected each session." There was no indication of what data would be collected and how data would be collected. Moreover, the District offered no IEP progress reporting for Lexi for this IEP. This is not surprising given the IEP's description of when periodic reports of progress will be provided to Lexi's parents was "conference with parents as needed."

22.     The District's November 24, 2010 IEP further failed to include *any* specially designed instruction, accommodations, or related services, with the exception of a mere 35 minutes per week of Speech and Language services, with no additional instruction or accommodations to address Lexi's needs in vocabulary, auditory comprehension, language expression, articulation, and attention to task, all of which the District agreed were areas of need for Lexi.

23.    In January 2011, the Parents asked for an assessment of Lexi's cognitive abilities, and gave consent to a District evaluation. The District issued a new "Evaluation Report" in March 2011, which, because Lexi had previously been evaluated and found to be an eligible student under IDEA, should have been termed a "Reevaluation Report."

24.    Not only was the District's March 28, 2011 "Evaluation Report" inappropriate, it was seemingly completed as if Lexi had not yet been identified as a special education student where she obviously was so identified. Astonishingly, the District's March 2011 ER determined Lexi was *not eligible* for special education services. However, she had already been determined eligible pursuant to the District's November 22, 2010 ER and was already receiving special education services pursuant to an IEP based on that ER. Nonetheless, the District's March 28, 2011 ER failed to indicate Lexi was already a special education student. Additionally, the District's March 28, 2011 ER failed to assess Lexi's executive functioning needs and failed to assess how her Speech and Language needs were impacting Lexi in the classroom.

25.    Despite the March 2011 ER's finding that Lexi was not eligible for special education under IDEA, the District developed a new IEP for her in November 2011, in her first grade year.

26.    The District's November 21, 2011 IEP was not appropriate. The IEP included the exact same three IEP goals as in the previous IEP, which Ms. Masko admitted meant that Lexi did not meet any of those goals over the 2010-2011 school year. Two additional goals were added into the November 21, 2011; however, both goals were designed to address Lexi's vocabulary skills, which were still a significant need. The IEP again did not include baselines or otherwise provide information regarding Lexi's level of functioning in the areas of need addressed by the goals.

27.     The IEP again included inadequate present levels of education that merely indicated Lexi was improving in areas of need, but failed to provide any specific information. The IEP again failed to provide an adequate description of how Lexi's progress toward her IEP goals will be measured.   Rather, the IEP merely indicated "data will be collected at each session."   Again, there was no further information regarding what data and how data would be collected.    Similar to the District's previous IEP for Lexi, the District again indicated "conference with parents as needed" as a description of when periodic reports of progress would be provided to Lexi's parents.  Not surprisingly, there was no IEP progress reporting for this IEP, thereby preventing Lexi's Parents and teachers from accurately assessing her progress, or lack thereof.

28.     The November 21, 2011 IEP again failed to include any specially designed instruction, accommodations, or related services, with the exception of a mere 35 minutes per week of small group Speech and Language services, with no additional instruction to address Lexi's needs in vocabulary, auditory comprehension, language expression, articulation, and attention to task, all of which the District agreed were areas of need for Lexi.

29.     Because the November 2011 IEP was inappropriate, Lexi failed to make appropriate educational progress, and, indeed regressed in key areas of Speech and Language.

30.     Lexi was again evaluated in November 2012, when she was in second grade.  The District's November 2, 2012 report (which was again inappropriately called an "Evaluation Report" rather than a "Reevaluation Report") was insufficient and inappropriate, but demonstrated that Lexi had regressed educationally.

31.     The "ER" merely included one formal assessment, the TOLD-4, to assess Lexi's Speech and Language functioning and one assessment of articulation. The District, once again,

failed to assess Lexi's executive functioning and how her Speech and Language Impairment was impacting her educational success in the classroom. Nonetheless, the District continued to find Lexi eligible as a student with Speech and Language Impairment due to her needs in vocabulary, understanding of syntax, and articulation skills.

32.    The District's ER indicated Lexi had *regressed* in areas of Speech and Language. The only formal assessment the District used to assess Lexi's Speech and Language functioning was the TOLD-4, which is the same assessment administered to Lexi by the District in November 2010. The results of the first administration to Lexi in November 2010, when she was in kindergarten, demonstrated she was functioning in the Average to Superior range in areas of Speech and Language, with the exception of articulation. Indeed, Ms. Masko testified that the results of Lexi's TOLD-4 administration in kindergarten shows that her language skills were "right where they need to be, but it does show that her articulation skills are poor and she would benefit from services to improve them."

33.    When Lexi was administered the same test two years later, she got fewer items correct than she did in kindergarten on five of the nine subtests, which is indicative of regression. In comparing the results of Lexi's administration of the TOLD-4 from November 2010 to November 2012, Lexi actually dropped from the Average range to the Below Average range in Relational Vocabulary; from the Above Average range to the Below Average range in Oral Vocabulary; and from the Average range to Below Average range in Syntactic Understanding. With one exception, Lexi dropped from the Average or Above Average range to the Below Average range in every single composite score on the TOLD-4.

34.    When Lexi was in kindergarten, she was, with the exception of word articulation, functioning consistent with or in some areas even better than her same age peers. By the time

10

she was in second grade, Lexi was functioning below average in Relational Vocabulary, Oral Vocabulary, Syntactic Understanding, Listening, Organizing, Grammar, Semantics, and Spoken Language, meaning that she was no longer functioning consistent with her same age peers. Furthermore, Ms. Masko specifically stated Lexi "fell" from kindergarten to second grade.

35. The results of the District's November 2012 ER also indicated that Lexi was still functioning significantly below her same-aged peers in articulation. Specifically, Lexi was functioning higher than only two percent of her same-aged peers in articulation and her impairment was indicated as "severe." Ms. Masko testified that in order to understand what Lexi was saying, you really had to listen carefully. She further agreed that Lexi was still having significant articulation errors despite having received two years of Speech and Language services for her articulation needs.

36. Despite Lexi's regression, the District continued to implement yet another IEP addressing the same skills as the previous two IEPs. Indeed, the District's November 16, 2012 IEP included goals that addressed the same skills as the previous two IEPs implemented for Lexi. Again, this IEP failed to offer *any* specially designed instruction or related services other than group Speech and Language services. Moreover, despite Lexi's regression, this IEP actually *reduced* Lexi's special education services and provided only 30 minutes per week of Speech and Language services.

37. On December 7, 2012, Lexi's mother requested that Lexi be reevaluated for reading comprehension because Lexi had poor performance in that area. In response, the District issued a Permission to Reevaluate on December 12, 2012, which Lexi's mother consented to on December 16, 2012, and then .subsequently and incorrectly issued a "Consent form" to evaluate Lexi not under IDEA bit under Section 504, despite the fact that she already

11

was an identified student receiving special education services under IDEA.  Moreover, the District did not perform any assessment of Lexi's reading comprehension despite the specific request by Lexi's mother for such testing, and further failed to conduct any assessments of Lexi's executive functioning, despite Lex's clear deficits in this area.  The result of the District's evaluation was a determination that Lexi was not an eligible student under Section 504.

38.    The District developed another IEP for Lexi in November 2013, in her third grade year.  This IEP, like her previous ones, was inappropriate.  The District's November 11, 2013 IEP included all of the same goals as the previous IEP, all of which Lexi did not meet.  Indeed, Ms. Masko testified that Lexi did not meet any of her IEP goals that were implemented for an entire year and the District's November 11, 2013 IEP provided for an additional seven months to one year to meet the same goals she had previously not met.  Again, the IEP failed to offer any specially designed instruction and related services, with the exception of an insufficient amount of 30 minutes of Speech and Language services in a small group, i.e., the same level and type of support that Lexi previously received, pursuant to which she failed to meet her IEP goals.

39.    Ms. Masko testified that to determine Lexi's educational progress, she relied on the IEP progress reports rather than the results of the TOLD-4 administrations.  However, the IEP progress reports that were offered by the District did not indicate Lexi made meaningful educational progress.  For the 2010-2011 and 2011-2012 IEP reporting periods, the District failed to offer any IEP progress reports as evidence of Lexi's progress in this matter.  The District's IEP progress reports for the 2012-2013 IEP reporting period indicated extremely minimal progress on her IEP goals.  In fact, the overwhelming majority of reporting periods over the year indicated Lexi was merely maintaining her previous abilities in some areas.  Moreover, the District's subsequent November 11, 2013 IEP included all of the same goals as the previous

IEP, all of which Lexi did not meet. Therefore, the evidence was clear that Lexi's IEPs did not allow her to make meaningful educational progress as mandated by IDEA and Section 504.

40.    The District's 2013-2014 IEP progress report, which provided, for the first time, *some* baseline data, but not in all areas of need, also failed to support the District's contention that Lexi made meaningful educational progress. Again, Lexi was making extremely minimal progress toward all of her "annual" IEP goals, which had already been implemented for over three years. Furthermore, Lexi was still only *maintaining* most of her skills in two out of the four goals. Ms. Masko testified that, in her opinion, Lexi's IEP progress report from November 12, 2013 to November 10, 2014 indicated Lexi was making progress because "she was meeting her goals as stated in her IEP." In fact, the evidence is clear that Lexi was *not* meeting her IEP goals within the proposed annual time frame.

41.    Prior to the development of the District's October 21, 2014 IEP, Lexi was evaluated by two independent evaluators. Dr. Maxine Young, a certified audiologist, conducted a Speech/Language evaluation of Lexi, and she issued an Independent Educational Evaluation ("IEE") in June 2014. Dr. Steven Kachmar, a licensed and certified school psychologist, performed a psychoeducational evaluation of Lexi, and he issued his IEE report in August 2014. The reports of Dr. Kachmar and Dr. Young were provided to the District and incorporated into the District's September 30, 2014 RR.

42.    The Speech/Language IEE, issued in June 2014, reflected parental concerns with reading comprehension, as well as receptive, expressive, and pragmatic language and articulation. While Lexi's hearing was normal, poor speech intelligibility was noted. Lexi demonstrated weaknesses with auditory processing and expressive language, and a possible ultra high frequency hearing loss was also suggested. Recommendations from Dr. Young were for

13

continued Speech/Language therapy to include listening skills; preferential seating; use of inflection, intonation, and good articulation; chunking of instructions; frequent checks for understanding; structure and routine throughout the school day; minimal distractions; and review of Student's assignment book for completeness.

43. Ms. Masko specifically agreed with the results of the IEE completed by Dr. Young and incorporated them into the Speech and Language component of the RR. She further agreed that the results of Lexi's TOLD-4 administration by Dr. Young in 2013 indicated Lexi is in the lower percentile for sentence combining for picture vocabulary and below average in listening.

44. Lexi scored poorly on Story Recall, which is part of the Oral language Standard scale on the Woodcock-Johnson III Tests of Academic Achievement ("WJ-III") Dr. Kachmar administered to Lexi in the Spring of 2014. The Oral Language subtest assesses listening ability as well as working memory ability and capacity to remember the string of oral directions and then sequentially perform the requested task. Lexi also scored in the Below Average range on the Functional Academics subtest of the WJ-III, which assesses central or core reading, writing, math and other functional skills.

45. Dr. Kachmar made a number of recommendations for Lexi's programming, including continued Speech/Language therapy, accommodations to address inattention, and monitoring of Lexi's emotional, behavioral, and executive functioning; and supported the recommendations of Dr. Young.

46. Lexi's IEP was revised following completion of the RR in October 2014. Lexi's present levels of academic achievement and functional performance were summarized, including results of the IEEs. Progress toward the Speech/Language goals was also provided. Annual

14

goals were revised, addressing continued articulation needs and further weaknesses with grammar and syntax as well as vocabulary, and included baselines. Program modifications/specially designed instruction were added to address attention, preferential seating, and need for comprehension checks. Under the IEP, Lexi would continue with the same type and amount of weekly individual or small group sessions as itinerant Speech/Language support that were contained in her previous IEPs.

47.    Lexi's IEP team convened again in October 2015. Lexi's present levels of academic achievement and functional performance were briefly summarized and progress toward the Speech/Language goals was provided. Annual goals with baselines addressed articulation and vocabulary including listening skills. No program modifications/specially designed instruction were included other than Speech/Language services. Again, Lexi would continue with once-per-week individual or small group sessions as itinerant Speech/Language support.

48.    Lexi failed to make appropriate progress under the District's 2014 and 2015 IEPs. The District's 2014-2015 and 2015-2016 IEP progress reports indicated Lexi was and is still working on the same skills she has been working on since kindergarten, including articulation of /r/, vocabulary, grammar and syntax, and making very little progress. In fact, a comparison of these IEP progress reports over two years demonstrated that Lexi made extremely minimal progress on the IEP goals during that time.

49.    It is not surprising that Lexi has made such minimal progress over the years as the District has not implemented any research-based program for Lexi throughout her time in the District. Furthermore, Lexi's parents attended all of Lexi's IEP meetings and no one from the District ever advised that Lexi was not meeting her IEP goals.

50.    Lexi's grades on tests that require reading comprehension have been and are predominantly poor from Lexi's kindergarten through fifth grade years. Specifically, Lexi performed poorly on many tests involving vocabulary and reading comprehension. Furthermore, the District would re-administer tests to Lexi when she failed, sometimes up to three times. In fact, the District's third grade teacher told Lexi's mother that of a student in the District does not perform well on a test, they simply re-administer the test. Lexi's third grade teacher testified that Lexi's test grades in reading comprehension were variable, some high and some low. She testified that the whole class struggled and blamed it on the curriculum. Lexi's fourth grade teacher testified that there were weeks Lexi struggled in reading comprehension, but she wasn't "overly concerned." Moreover, Lexi scored Basic in English Language Arts and Below Basic in Mathematics on the Spring 2015 Pennsylvania System of School Assessment ("PSSA"). Overall, Lexi has struggled in reading comprehension and speech articulation from her kindergarten through fifth grade years.

## V.    Statutory Authority

51.    The purpose of the IDEA is to ensure that "all children with disabilities have available to them a free and appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400 (d)(1)(A). IDEA and the regulations thereunder, 34 C.F.R. § 300.100 et seq., and 22 Pa. Code Chapter 14, require that public school districts provide disabled children with a FAPE, as well as provide extensive due process procedures to effectuate that right.

52.    Pursuant to these statutes and regulations, school districts have a continuing obligation to properly evaluate and accurately identify all students who are reasonably suspected

16

of possessing a disability under IDEA or Section 504. Ridgewood Bd. of Educ. v. N.E., 172 F.3d 238 (3d Cir. 1999); W.B. v. Matula, 67 F.3d 484 (3d Cir. 1995), abrogated in part on different grounds, A.W. v. Jersey City Public Schools, 486 F.3d 791 (3d Cir. 2007); T.B. v. School Dist. of Phila., 1997 WL 786448 (E.D. Pa. 1997).

53.    Such an obligation is known as "child find." 34 C.F.R. Section 300.111. There are two aspects of child find. The first component involves the District's initial obligation to commence an evaluation of a student whom the District should reasonably suspect to be disabled. Under this first component of child find, the District's obligation to serve a student commences within a reasonable time after the District should have suspected the child to be disabled, with the District being allowed "reasonable time" to conduct an evaluation, identify the student as disabled, and formulate an appropriate program for the child. Id.

54.    The second aspect of child find involves the actual identification of every student with disabilities. Id. See also M.C. v. Central Regional School Dist., 81 F.3d 389 (3d Cir. 1996); Big Beaver Falls Area School Dist. v. Jackson, 615 A.2d 910 (Pa. Commw. Ct. 1992). The child find obligation also requires that districts appropriately evaluate and identify all students who are suspected of being disabled, including those not attending the District. The federal courts have repeatedly and unequivocally affirmed the breadth of this obligation. Ridgewood Bd. of Educ. v. N.E., 172 F.3d 238 (3d Cir. 1999); Matula, 67 F.3d at 492; T.B. v. School Dist. of Phila.,1997 WL 786448 (E.D. Pa. 1997); PARC v. Commonwealth, 343 F. Supp. 279 (E.D. Pa. 1972).

55.    Under the IDEA, an "appropriate education" is a series of services described in an Individualized Education Program ("IEP") that is reasonably calculated to afford meaningful educational progress in the Least Restrictive Environment ("LRE"). Chambers v. Philadelphia

17

Bd. of Educ., 587 F.3d 176, 182 (3d Cir.2009); M.C., 81 F.3d at 394; Oberti v. Board of Educ. of Borough of Clementon School Dist., 995 F.2d 1204, 1214-15 (3d Cir. 1993).  The fundamental purpose of the IDEA is to ensure that "all children with disabilities have available to them a free and appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living."  20 U.S.C. § 1400 (d)(1)(A).  IDEA and the regulations thereunder, 34 C.F.R.§ 300.100 et seq., and 22 Pa. Code Chapter 14, require that public school districts provide disabled children with a FAPE, which includes the LRE requirement.  34 C.F.R. §§ 300.17, 300.114-117, 300.320 (various subsections related to LRE).

56.    In addition to LRE principles, the IDEA provides that an IEP team, which includes both school district officials and the child's parents, must develop an appropriate educational program and placement for each eligible child through an IEP.  A two-pronged analysis applies in reviewing a school district's IEP development under the IDEA: (1) whether the District complied with the procedures set forth in the IDEA; and (2) whether the IEP developed through the IDEA's procedures is reasonably calculated to enable the child to receive meaningful educational benefit.  Board of Educ. v. Rowley, 458 U.S. 176, 206-07 (1982). See also Shore Regional High School Bd. of Educ. v. P.S., 381 F.3d 194, 198 (3d Cir. 2004); Ridgewood Bd. of Educ. v. N.E., 172 F.3d 238, 247 (3d Cir. 1999); Polk v. Central Susquehanna Intermediate Unit 16, 853 F.2d 171, 184 (3d Cir. 1988).

57.    The IEP is the cornerstone of the special education program for a student. Ridgewood, 172 F.3d at 247; Polk, 853 F.2d at 173. The IDEA requires that every IEP include: comprehensive educational levels; measurable annual goals; a statement of special education, Related Services and supplementary aids and services to be provided to the child; and an

18

explanation of the extent to which the child will be educated with non-disabled students. 20 U.S.C. § 1414(d); 34 C.F.R. § 300.320. Thus, for a child with a qualifying disability, "a 'free appropriate public education' consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." Rowley, 458 U.S. at 188–89.

58.    It is the School District's non-delegable obligation to create an appropriate IEP. Shore Regional High School Bd. of Educ. v. P.S., 381 F.3d 194, 199 (3d Cir. 2004), Carlisle Area School Dist. v. Scott P., 62 F.3d 520, 533 (3d Cir. 1995); Furhmann v. East Hanover Bd. of Educ., 993 F.2d 1031, 1035 (3d Cir. 1993). Even a parent's failure to participate in a meaningful manner in the IEP process will not excuse an inappropriate IEP. Warren G. v. Cumberland Valley School Dist., 190 F.3d 80 (3d Cir. 1999); Susquenita Sch. Dist. v. Raelee S., 96 F.3d 78 (3d Cir. 1996).

59.    The Supreme Court has determined the IEP to be the "primary vehicle" and the "centerpiece of the statute's education delivery system for disabled children," and to embody the substantive standard for school districts' obligation to provide FAPE to children with disabilities. Honig v. Doe, 484 U.S. 305, 311 (1988). Therefore, when an eligible child with a disability is denied an appropriate IEP and the special education and related services described and promised therein, the child is denied FAPE.

60.    The Third Circuit Court of Appeals has also clarified that under the IDEA, a child with a disability is entitled to a program that is reasonably calculated to confer *meaningful* educational benefit. Polk, 853 F.2d at 184; Oberti v. Board of Educ. of Borough of Clementon School Dist., 995 F.2d 1204, 1213 (3d Cir. 1993); Ridgewood, 172 F.3d at 247. In order to provide meaningful benefit, a child's IEP must include academic and functional goals designed

19

to meet the child's educational needs that result from the child's disability. 34 C.F.R. § 300.320(a)(2)(i).

61. It is abundantly well settled that "education" extends beyond discrete academic skills, and includes the social, emotional, and physical progress necessary to move the child toward meaningful independence and self-sufficiency consistent with the child's cognitive potential. M.C. v. Central Regional School Dist., 81 F.3d 389, 393-394 (3d Cir. 1996); Polk, 853 F.2d at 181-182; Kruelle v. New Castle County School Dist., 642 F.2d 687, 693 (3d Cir. 1981); Armstrong v. Kline, 629 F.2d 269 (3d Cir. 1980); Bucks County Public Schools v. Department of Educ., 529 A.2d 1201 (Pa. Cmwlth. 1987); Big Beaver Falls Area Sch. Dist. v. Jackson, 615 A.2d 910 (Pa. Cmwlth. 1992). Therefore, for an IEP to be appropriate, it must offer a child the opportunity to make progress that is "meaningful" in all relevant domains under IDEA, including behavioral, social and emotional. M.C., 81 F.3d at 394; Ridgewood, 172 F.3d at 247. In determining whether the IEP is appropriate, the Court must determine whether the IEP offers "meaningful benefit" and "significant learning" in light of the child's potential and the court may consider post-IEP progress in deciding if FAPE was provided. G. "J." D. v. Wissahickon School Dist., 832 F. Supp.2d 455 (E.D. Pa. 2011).

62. Pursuant to these standards, the Hearing Officer correctly found that the District failed to provide Lexi with a FAPE from mid-September 2011 through mid-November 2013. However, the Hearing Officer failed to award sufficient compensatory education to properly compensate the Family for the District's failures.

63. When a District fails to provide FAPE, it is well-settled that compensatory education is an available remedy for the student under IDEA, Section 504, and/or the ADA. Lester H. v. Gilhool, 916 F.2d 865, 868-69 (3d Cir. 1990); Ridgewood, 172 F.3d at 250 n.11;

M.C., 81 F.3d at 397. Compensatory education is designed to provide eligible students with the benefit of the services they should have received pursuant to a FAPE. Lester H., 916 F.2d at 873 (award of compensatory education merely compensated the student for an inappropriate placement, belatedly allowing student to receive the remainder of his FAPE). The amount of compensatory education is calculated by finding the period of deprivation of special education services and excluding the time reasonably required for the school district to rectify the problem. M.C., 81 F.3d at 397. Thus, compensatory education is an in-kind remedy intended to provide educational services denied to a child by a school district's failure to provide a FAPE. Lester H., 916 F.2d at 873. The Third Circuit has recently found that an appropriate remedy for a failure to provide FAPE is "the establishment of a fund to be spent on the child's education." D.F. v. Collingswood Borough Bd. of Educ., 694 F.3d 488, 498 (3d Cir. 2012).

64. In G.L. v. Ligonier Valley School Dist, 802 F.3d 601 (3d Cir. 2015), the Court specifically noted that once a parent has filed a timely action under the IDEA, then that child is entitled to be *made whole* with nothing less than a complete remedy, regardless of the specific time period of the deprivation. Id. at 625. The court noted its broad discretion to award compensatory education to whatever extent necessary to make up for the child's lost progress and to restore the child to the educational path he would have traveled but for the deprivation.

65. The Hearing Officer's award of compensatory education fails to meet the above standards. The Hearing Officer based her award of compensatory education by merely mathematically awarding, for the period of educational deprivation, the 35 minutes of Speech/Language therapy that Lexi received for part of that time. However, the Hearing Officer failed to take into account that this amount of time was clearly not sufficient to allow Lexi to make meaningful educational progress, as demonstrated by her failure to meet any of her IEP

21

goals, such that these goals needed to be repeated year after year. Clearly, Lexi needed not only *different*, i.e., *effective, research-based*, Speech/Language services, she required more than the mere 35 minutes of services that she received each week. Moreover, there is no indication that Lexi could be "made whole" following the District's years of failing to provide her with a FAPE by an award of a total of merely 47 hours of compensatory education. G.L., 802 F.3d at 625. Therefore, it was clear error for the Hearing Officer to solely base her compensatory education award on what was a clearly insufficient level of support for Lexi over a period of years.

66.    The Hearing Officer further erred in finding that the District's November 2010, March 2011, and November 2012 evaluations were appropriate. The District's evaluations inappropriately failed to assess Lexi's functioning in executive functioning and reading comprehension, despite Lexi's demonstrated weaknesses in those areas, and also failed to appropriately and comprehensively assess her Speech/Language needs.

67.    The Hearing Officer also erred in finding that the District provided Lexi with a FAPE from mid-November 2013 and continuing forward. The District's November 2013 IEP was clearly inappropriate as it, among other deficiencies, contained the same goals as her previous IEP, clearly indicating that: (a) Lexi had failed to make meaningful educational progress; and (b) the IEP goals were inappropriate. See County School Bd. of Henrico County v. R.T., 422 F. Supp.2d 657, 686 (E.D. Va. 2006) (finding IEP inappropriate where "seventeen out of the twenty-four IEP goals" were in previous IEPs, and student "had not achieved two-thirds of those goals"); Laura P. v. Haverford School Dist., 2008 WL 5000461 at *5 (E.D. Pa. Nov. 21, 2008) (inappropriateness of IEPs is demonstrated by fact that "the reporting and setting of IEP goals are ... nearly identical from one IEP to the next beginning with the November 2004 IEP"; "The [consecutive] IEPs all repeat nearly verbatim that Vivian made great progress in all

22

areas of her IEP but each IEP then unaccountably lists substantially the same goals as listed in the previous IEP.... In light of the repetitiveness and lack of meaningful progress reporting in her IEPs, I must conclude that Vivian was denied FAPE for that period."), abrogated on other grounds, Steven I. v. Central Bucks School Dist., 618 F.3d 411 (3d Cir. 2010). Moreover, as before, Lexi did not receive research-based instruction as required by IDEA. 20 U.S.C. § 1414(d)(1)(A)(i)(IV); 34 C.F.R. §300.320(a); D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 566 and 566 n.7 (3d Cir. 2010) (IEP was inappropriate because it "failed to incorporate... specific remedial techniques and provisions for accommodations"; in particular, IEP failed to specify an "intensive remedial multi-sensory program for instruction in reading comprehension and writing").

68.    While the District's IEPs from November 2013 forward remedied the previous IEPs' deficiencies in not providing baselines as to the annual goals, the IEPs nevertheless failed to provide Lexi with a FAPE, as demonstrated by her failure to make meaningful educational progress from November 2013 forward. Again, the IEPs failed to offer any specially designed instruction and related services, with the exception of only 30 minutes of non-research based Speech and Language services in a small group, which clearly was insufficient to address her needs. Moreover, the IEPs still contained the same unmet goals that Lexi had been working on since kindergarten.

69.    It is clear that the District's failure to provide Lexi with a FAPE, in addition to constituting a violation of IDEA, also constituted an independent violation of Section 504, and the Hearing Officer erred in not addressing the Family's independent claims under Section 504.

70.    Under Section 504, recipients of federal funds are required to "provide a free appropriate public education [FAPE] to each qualified handicapped person who is in the

23

recipient's jurisdiction, regardless of the nature or severity of the person's handicap." 34 C.F.R. § 104.33(a). The term "appropriate education" is defined as "the provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of the handicapped persons as adequately as the needs of non-handicapped persons are met and (ii) are based on adherence to the procedures that satisfy the requirements of Sections 104.34, 104.35, and 104.36." 34 C.F.R. § 104.33(b).

71.    Section 504 prohibits the exclusion of, or discrimination against, handicapped persons in federally funded programs such as public education. Section 504 and its regulations require the identification of all disabled children and the provision of appropriate educational services. 29 U.S.C. § 794; 34 C.F.R. § 104.1 et seq. Failure to provide accommodations, supplemental services and FAPE constitutes unlawful discrimination for purposes of Section 504.

72.    Under Section 504, a "handicapped person" is defined as "any person who has a physical or mental impairment which substantially limits one or more major life activities." 34 C.F.R. § 104.3. The term "physical or mental impairment" is defined as "any physical or psychological disorder such as . . . emotional or mental illness and specific learning disabilities." Id. The term "major life activities" is defined as "functions such as caring for one's self ... learning, and working." Id.

73.    Section 504 provides specific requirements for Local Educational Agencies ("LEAs") such as the District to protect all handicapped students, even those who may not qualify under the categorical listings of IDEA. Section 504 requires that "a public elementary or secondary education program shall annually undertake to identify and locate every qualified handicapped person residing in the recipient's jurisdiction who is not receiving a public

24

education and take appropriate steps to notify handicapped persons and their parents or guardians of the recipient's duty under this subpart." 34 C.F.R. § 104.32; Ridgewood Board of Education v. N.E., 172 F.3d 238, 253 (3d Cir. 1999); W.B. v. Matula, 67 F.3d 484, 500-01 (3rd Cir. 1995), abrogated on different grounds, A.W. v. Jersey City Public Schools, 486 F.3d 791 (3d Cir. 2007). The LEA must identify all children who are suspected of having a disability, and must also ensure that its evaluations to determine actual eligibility for services occur within a reasonable time after school officials are notified of a child who is likely to have a disability. Matula, 67 F.3d at 501.

74.     In order to establish a violation of Section 504, a plaintiff must prove that: (1) she is "disabled" as defined by the Act; (2) she is "otherwise qualified" to participate in school activities; (3) the school or the board of education receives federal financial assistance; and (4) she was excluded from participation in, or denied the benefits of, or subject to discrimination at, the school.   Ridgewood,172 F.3d at 253; Andrew M. v. Delaware Cty. Office of Mental Health and Mental Retardation, 490 F.3d 337, 350 (3d Cir. 2007).

75.     Children denied services under the IDEA are "otherwise qualified" to participate in school and are denied that education because of their disabilities.   Id.

76.     "When a state fails to provide a disabled child with a free and appropriate education, it violates the IDEA.  However, it also violates [Section 504] because it is denying a disabled child a guaranteed education merely because of the child's disability.  It is the denial of an education that is guaranteed to all children that forms the basis of the claim."  Andrew M., 490 F.3d at 350.

77.     Thus, the substantive requirements of Section 504 in the education context are largely, but not entirely, equivalent to the requirements under the IDEA.  James S. v. School

Dist. of Phila., 559 F. Supp.2d 600, 620 (E.D. Pa. 2008) (citing Molly L. v. Lower Merion School Dist., 194 F. Supp.2d 422, 426 (E.D. Pa. 2002)). Section 504 "is broader in scope [than [IDEA].... The definition of 'individual with a disability' under § 504 of the Rehabilitation Act is broader in certain respects than the definition of a 'child with [a] disabilit[y]' under the IDEA." Muller v. Commission on Special Educ. of E. Islip Union Free School Dist., 145 F.3d 95, 100 n.2 (2d Cir.1998). A school may violate Section 504 independent of any violations of IDEA. Lauren G. v. West Chester Area School Dist.,906 F. Supp.2d 375 (E.D. Pa. 2012) (granting tuition reimbursement for school district's failure to provide FAPE under Section 504 during period of time for which no relief was granted under IDEA).

78.     Lexi is a student who, at all times relevant to this Complaint, is and was disabled, and is and was otherwise qualified to participate in, and receive equal benefits from, the Defendant's educational programs with appropriate instruction, accommodations and supplemental supports for purposes of Section 504.

79.     Throughout her time in the District, the District failed to provide Lexi with appropriate educational and related services, accommodations and supplemental services that she required in order to have equal access to the benefits of the District's programs and services and to make appropriate developmental and educational progress equal to that provided to children without disabilities.

80.     Defendant's failure to provide a non-discriminatory, appropriate educational environment for Lexi and to properly accommodate her disabilities has exacerbated the impact of her disabilities; interfered with her ability to communicate with others and to meaningfully participate with typically developing peers; and deferred her ability to engage and be included in age-appropriate social, educational and vocational programs, opportunities and services to which

she would have had access if she had received appropriate related services and accommodations in a timely and effective manner, thus excluding her from the least restrictive environment, her family, and to equal access to educational benefits. Lexi was excluded from participation in, denied the benefits of, or subject to discrimination at, her educational program.

81. Defendant is the recipient of federal financial assistance.

82. Because the District violated Section 504, it also violated the ADA. The ADA provides, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." The Third Circuit has held that the ADA "extends the nondiscrimination rule of [Section 504] to services provided by any 'public entity' (without regard to whether the entity is a recipient of federal funds)." Jeremy H. v. Mount Lebanon School Dist, 95 F.3d 272, 279 (3d Cir. 1996). That court held that "the remedies, procedures, and rights" applicable to Section 504 claims are the same as those under the ADA. Id.; see also Tereance D. v. School Dist. of Philadelphia, 548 F. Supp.2d 162, 169-70 (E.D. Pa. 2008) (applying same analysis to claims under ADA as to claims under Section 504); Indiana Area School Dist. v. H.H., 428 F. Supp.2d 361, 363 n.3 (W.D. Pa. 2006) ("[T]he Third Circuit generally has held that the same analysis under § 504 applies in determining whether a defendant's actions violate the ADA.")

83. Lexi is a qualified individual with a disability for purposes of the ADA.

84. As set forth above, the District excluded Lexi from participation in, and denied her the benefits of the services, programs or activities of, a public entity. The District failed to ensure that Lexi was provided with appropriate educational and related services, accommodations and supplemental services which she required in order to have access to the

27

District's programs and services and to make appropriate developmental and educational progress equal to that provided to children without disabilities in violation of the ADA.

85. The District's failures to provide and ensure an appropriate educational environment to Lexi and to properly accommodate her disabilities have exacerbated the impact of her disabilities and deferred her ability to engage and be included in age-appropriate social, educational and vocational programs, opportunities and services to which she would have had access if she had received appropriate related services and accommodations in a timely and effective manner, thus excluding her from the mainstream of her school, her community, her family, and to equal access to educational benefits, all in violation of the ADA.

86. The IDEA provides that an aggrieved party has the right to bring a civil action in federal district court, which conducts an independent review of the administrative record and any additional evidence presented by the parties. Shore Regional High Sch., 381 F.3d at 198; Scott P., 62 F.3d at 527; Matula, 67 F.3d at 492; Susan N. and David N. v. Wilson School Dist., 70 F.3d 751, 756-757 (3d Cir. 1995); Delaware County Intermediate Unit v. Martin K., 831 F. Supp. 1206, 1220 (E.D. Pa. 1993). See also 20 U.S.C. § 1415(i)(2); 34 C.F.R. § 300.516(c)(3).

87. Moreover, Section 504, IDEA, and the ADA all permit recovery of reasonable attorneys' fees by parents who prevail in an action or proceeding thereunder. 42 U.S.C. § 12205; 20 U.S.C. 1415 § 615 (i)(3)(B); 34 C.F.R. § 300.517; 29 U.S.C. § 794a; Andrew M. v. Delaware County Office of Mental Health/Mental Retardation, 2005 WL 783070 at *15 (E.D. Pa. 2005) (attorneys' fees are recoverable under Section 504); Daniel S. v. Scranton School Dist., 230 F.3d 90, 95 (3d Cir. 2000) (attorneys' fees are recoverable under IDEA); Spencer v. Wal-Mart Stores, Inc., 469 F.3d 311 (3d Cir. 2006) (attorneys' fees are recoverable under the ADA).

88. Plaintiffs, having obtained an award of compensatory education, are the

28

prevailing parties below, and are therefore entitled to an award of attorneys' fees and costs. The Family expects to obtain additional relief in the present proceeding, thereby entitling Plaintiffs to an additional award of statutory attorneys' fees and costs.

89.     The IDEA clearly requires an independent review of the administrative decision and permits a court to grant the relief sought by Plaintiffs, since the statute expressly endows courts with broad authority to grant "such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(A); 34 C.F.R. § 300.516(c)(3). The IDEA further provides that federal courts hearing such matters "shall hear additional evidence at the request of a party." 20 U.S.C. § 1415(i)(2)(C)(ii).

WHEREFORE, the Plaintiffs respectfully request that this Court:

1.      Assume jurisdiction over this action;

2.      Hear additional evidence as appropriate pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii).

3.      Reverse the decision of the Hearing Officer to the extent that it failed to find that the District failed to provide Lexi a FAPE starting with Lexi's kindergarten year and continuing through the present, and failed to award a sufficient amount of compensatory education;

4.      Order the District to pay appropriate compensatory education for the relevant time period, to be used within the reasonable discretion of Lexi's Parents;

5.      Order the Defendant to pay Plaintiffs their reasonable attorneys' fees and related costs;

6.      Declare the Defendant's actions and omissions to be violative of IDEA, Section 504, the ADA, and Pennsylvania law; and

29

7. Grant such other relief as this Court deems proper.

Respectfully submitted,

Dennis C. McAndrews, Esquire
ID No. 28012

Heather M. Hulse, Esquire
ID No. 164134

Michael E. Gehring, Esquire
ID No. 57224

MCANDREWS LAW OFFICES
Attorneys for Plaintiffs
30 Cassatt Avenue
Berwyn, PA
(610) 648-9300 (phone)
(610) 648-0433 (fax)
Attorneys for Plaintiffs